IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

UNITED STATES OF AMERICA,

    *Plaintiff,*

       v.

ELENA MIKIRTICHEVA and

ANDREY MIKIRTICHEV,

    *Defendants.*

_____

Civil Action Number:  3:23-cv-552

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff, United States of America, by authority of the Attorney General of the United States and through its undersigned attorneys, files this Complaint and alleges as follows:

### INTRODUCTION

1.     This is a civil action against Elena Mikirticheva and Andrey Mikirtichev for violations of the Animal Welfare Act ("AWA"), and its implementing regulations and standards.

2.     Congress enacted the AWA for a number of purposes, including to ensure that commercial activity related to animals intended to be used as pets is conducted in a way that provides humane care and treatment. 7 U.S.C. § 2131(1). The AWA imposes "minimum requirements" for handling, housing, feeding, watering, sanitation, and adequate veterinary care, among other requirements. 7 U.S.C. § 2143(a)(2)(A).

3.     Defendants operate a cat and dog breeding facility in North Chesterfield, Virginia ("Chesterfield facility"). They hold AWA license 52-B-0175 to breed and sell cats and dogs that was issued by the United States Department of Agriculture ("USDA").

4.     Since March 2023, Defendants have amassed over 50 citations for failing to meet the AWA's minimum requirements, including for serious violations such as the failure to provide adequate veterinary care. For example, on July 24, 2023, USDA Animal and Plant Health Inspection Service ("APHIS") inspectors discovered that Defendants were aware that a male brown tabby kitten had been born with a malformed chest that was compressed inward, reducing the space for the heart and lungs, but had failed to notify the attending veterinarian about the kitten's condition. Exhibit 13 at 2 (July 24, 2023 Inspection Report). Instead, Defendant Mikirtichev decided to treat the condition himself by attempting to splint the chest cavity with a toilet paper tube, which was unsuccessful. *Id.*

5.     Two weeks later when APHIS inspectors returned, they found the kitten still housed in an enclosure containing four adult female cats and 13 additional kittens. Exhibit 14 at 3-4 (August 9, 2023 Inspection Report).[1] The kitten exhibited respiratory distress, had active diarrhea that had adhered to the fur of the kitten's hind end and legs, and was thin and in poor body condition. *See id.* at 4*; see also* photo below. Once again, Defendant Mikirtichev acknowledged that they were aware of the kitten's poor condition but failed to communicate the kitten's condition to the attending veterinarian. *See* Exhibit 14 at 4. Defendant Mikirtichev was directed to immediately seek veterinary care for the kitten. Defendants' attending veterinarian communicated to APHIS inspectors that the kitten died the evening of the August 9, 2023 inspection.

---

[1] The inspection report from August 9, 2023, may still be appealed by Defendants.



6.      APHIS inspectors observed another cat on July 24, 2023, so thin that an official was able to encircle the cat's spine and have her fingers touch underneath. *See* Exhibit 13 at 3; *see also* photo below.



7.      In addition to their failure to provide the cats and dogs adequate veterinary care, Defendants have placed the health of their animals in serious danger by exposing them to unsafe and unsanitary conditions, by housing incompatible cats together, resulting in injury or lack of access to food and water, and by housing the animals in tiny enclosures that do not even meet the

AWA's minimum requirements, thereby negatively impacting the animals' health and well-being.

8.     Following the August 9, 2023 inspection, USDA determined that Defendants were placing the health of the animals at their Chesterfield facility in "serious danger." 7 U.S.C. § 2159(a). In addition, in response to the numerous recent violations of the AWA, the USDA APHIS Administrator issued a 21-day suspension of license 52-B-0175 on August 11, 2023, which was served on Defendants on August 14, 2023. *See* Exhibit 1 (Notice of Suspension).

9.     USDA then filed an administrative complaint seeking permanent revocation of Defendants' license on August 25, 2023.

10.     Defendants' indifference to the welfare of their dogs and cats has resulted in the needless suffering of those animals.

11.     Defendants have demonstrated that they are either unwilling or unable to adequately care for the dogs and cats at their Chesterfield facility. Their actions have placed and are continuing to place the health of those animals in serious danger in violation of the AWA and its regulations and standards.

12.     For the foregoing reasons, the United States complains and seeks a temporary restraining order and other injunctive and declaratory relief.

## JURISDICTION AND VENUE

13.     The Court has jurisdiction over this action pursuant to 7 U.S.C. § 2146(c) (actions arising under the AWA); 28 U.S.C. § 1331 (federal question jurisdiction); and 28 U.S.C. § 1345 (United States as plaintiff).

14.     Venue is proper in the United States District Court for the Eastern District of Virginia pursuant to 7 U.S.C. § 2159 (where Defendants conduct business) and 28 U.S.C. § 1391.

15. The Court may grant the requested relief under the AWA, 7 U.S.C. §§ 2146(c), 2159, and 28 U.S.C. §§ 2201, 2202 (declaratory and injunctive relief).

## THE PARTIES

16. Plaintiff is the United States of America. Authority to bring this action is vested in the Attorney General of the United States pursuant to 28 U.S.C. §§ 516, 519, and 7 U.S.C. § 2159.

17. Defendants are AWA-licensed dealers who operate a dog and cat breeding facility at 3000 Bensley Rd., North Chesterfield, Virginia, 23237. Upon information and belief, Defendants reside at a different location. Upon information and belief, Defendants own, deal in, and/or breed the animals that are the subject of this action in the Eastern District of Virginia.

## LEGAL BACKGROUND

18. The AWA establishes minimum standards of care and treatment to be provided for certain animals bred and sold for use as pets, used in biomedical research, transported commercially, or exhibited to the public. *See generally* 7 U.S.C. § 2131 *et seq.*

19. The AWA is administered by the Secretary of Agriculture or his representative. 7 U.S.C. § 2132(b). The AWA authorizes the Secretary to "promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of [the AWA]." 7 U.S.C. § 2151. The Secretary has delegated his authority to the APHIS Administrator. APHIS's Animal Care inspectors conduct inspections of facilities to determine compliance with the AWA and its implementing regulations and standards.

20. The AWA defines a "dealer" as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports, except as a carrier, buys, or sells, or negotiates the purchase or sale of, (1) any dog or other animal whether alive or dead for research, teaching,

exhibition, or use as a pet." 7 U.S.C. § 2132(f); *see also* 9 C.F.R. § 1.1 (definition of dealer).

21.    A Class "B" licensee is a person subject to AWA licensing requirements, who meets the definition of a "dealer" and whose business also includes the purchase and/or resale of any animal. *See* 9 C.F.R. § 1.1 (definition of Class "B" licensee).

22.    Anyone who falls within the statutory definition of a dealer must obtain and maintain a valid license from the Secretary. 7 U.S.C. § 2134; *see also* 9 C.F.R. § 2.1(a)(1) (licensing requirements). No dealer shall sell or offer to sell or transport or offer for transport in commerce any animal for use as a pet unless the dealer has a valid AWA license.

23.    By signing the application form, applicants acknowledge that they have reviewed the AWA and its regulations and standards and "agree[] to comply with them." 9 C.F.R. § 2.2.

24.    Regulated activities may be conducted only at sites that have been inspected and approved by APHIS. 9 C.F.R. § 2.1(b)(1).

25.    The AWA makes it unlawful for any dealer to knowingly violate the AWA. 7 U.S.C. § 2149(d).

26.    The Secretary has promulgated regulations and standards to govern the humane handling, care, treatment, and transportation by dealers, which includes the minimum requirements for handling, housing, feeding, watering, sanitation, ventilation, shelter from extreme weather and temperatures, adequate veterinary care, and separation by species. 7 U.S.C. § 2143(a)(1)-(a)(2)(A). Dealers must comply in all respects with the regulations and standards for the humane handling, care, treatment, and transportation of cats and dogs.

27.    When construing or enforcing the provisions of the AWA, the act, omission, or failure of any person acting for or employed by a dealer is deemed the act, omission, or failure of the dealer. 7 U.S.C. § 2139.

28.     With regard to veterinary care, each dealer must employ an "attending veterinarian under formal arrangements," who "shall provide adequate veterinary care to [the dealer's] animals in compliance with [the AWA]." 9 C.F.R. § 2.40(a); *see also* 9 C.F.R. § 1.1 (definition of "[a]ttending veterinarian"). The dealer must "assure that the attending veterinarian has appropriate authority to ensure the provision of adequate veterinary care and to oversee the adequacy of other aspects of animal care and use." 9 C.F.R. § 2.40(a)(2).

29.     The dealer must "establish and maintain" a program of "adequate veterinary care" that addresses the "use of appropriate methods to prevent, control, diagnose, and treat diseases and injuries, and the availability of emergency, weekend, and holiday care." 9 C.F.R. § 2.40(b)(2). The program of veterinary care must also include "[d]aily observation of all animals to assess their health and well-being" and, although the daily observation "may be accomplished by someone other than the attending veterinarian," there must be a "mechanism of direct and frequent communication" so that "timely and accurate information on problems of animal health, behavior, and well-being is conveyed to the attending veterinarian." 9 C.F.R. § 2.40(b)(3).

30.     With regard to facilities, the surface of housing facilities must be constructed in a way that allows them "to be readily cleaned and sanitized, or removed or replaced when worn or soiled." 9 C.F.R. § 3.1(c)(1). "All surfaces must be maintained on a regular basis" and those surfaces that "cannot be readily cleaned and sanitized, must be replaced when worn or soiled." 9 C.F.R § 3.1(c)(2).

31.     Substances toxic to dogs or cats cannot be stored in food storage or preparation areas. 9 C.F.R. § 3.1(e).

32.     Unless specifically approved by the attending veterinarian, breeds of dogs, such as

French bulldogs, that cannot tolerate the prevalent temperatures of the area without stress or discomfort must not be kept in outdoor facilities. 9 C.F.R. § 3.4(a)(1)(ii).

33.     Outdoor facilities for dogs or cats "must include one or more shelter structures that are accessible to each animal in each outdoor facility, and that are large enough to allow each animal in the shelter structure to sit, stand, and lie in a normal manner, and to turn about freely." 9 C.F.R. § 3.4(b). Shelters in outdoor facilities for dogs or cats must contain clean, dry, bedding material if the ambient temperature is below 50ºF. Additional clean, dry bedding is required when the temperature is 35ºF or lower. *Id*.

34.     Primary enclosures for cats or dogs must be constructed and maintained so that they "[h]ave no sharp points or edges that could injure the dogs and cats," "[c]ontain the dogs and cats securely," "[e]nable the dogs and cats to remain dry and clean," "[p]rovide all the dogs and cats with easy and convenient access to clean food and water," and "[e]nable all surfaces in contact with the dogs and cats to be readily cleaned and sanitized in accordance with § 3.11(b) of this subpart, or be replaceable when worn or soiled." *See* 9 C.F.R. § 3.6(a)(2).

35.     Primary enclosures must "[p]rovide sufficient space to allow each dog and cat to turn about freely, to stand, sit, and lie in a comfortable, normal position, and to walk in a normal manner." *See id.* Each cat, including weaned kittens, that is housed in any primary enclosure must be provided minimum vertical space and floor space. 9 C.F.R. § 3.6(b). Specifically, each primary enclosure housing cats must be at least 24 inches high. Additional space requirements are determined based on the weight of the cats. *See id.*

36.     All cats housed in the same primary enclosure must be compatible, as determined by observation. 9 C.F.R. § 3.6(b)(2). Not more than 12 adult nonconditioned cats may be housed in the same primary enclosure. *Id.* Cats with vicious or aggressive disposition must be housed

8

separately. *Id.*

37.     Primary enclosures must be cleaned daily to remove excreta, and to reduce disease hazards, insects, pests, and odors. 9 C.F.R. § 3.11(a). The surrounding buildings and grounds must be in good repair and free of trash, junk, waste products, and discarded matter to protect the animals from injury. 9 C.F.R. § 3.11(c).

38.     Each person subject to the AWA and who is maintaining dogs and cats must have enough employees to carry out the level of husbandry practices and care required by the AWA, and its implementing regulations and standards. 9 C.F.R. § 3.12. "The employer must be certain that the supervisor and other employees can perform to these standards." *Id.*

39.     A Class B dealer "shall identify all live dogs and cats under his or her control or on his or her premises as follows: '[w]hen live dogs or cats are held, purchased, or otherwise acquired, they shall be immediately identified' '[b]y affixing to the animal's neck an official tag as set forth in § 2.51 by means of a collar made of material generally acceptable to pet owners as a means of identifying their pet dogs or cats' or '[b]y a distinctive and legible tattoo.'" 9 C.F.R. § 2.50(b)(1).

40.     Dealers must make, keep, and maintain records for at least one year pertaining to the purchase, sale, transportation, identification, and previous ownership of the animal, which fully and correctly discloses information concerning the animal purchased or otherwise acquired, owned, held, or otherwise in his or her control or which is transported, euthanized, sold, or otherwise disposed of by that dealer. 9 C.F.R. §§ 2.75(a)(1), 2.80(a). "The records shall include any offspring born of any animal while in his or her possession or under his or her control." 9 C.F.R. § 2.75(a)(1).

41.     Dealers must also keep copies of medical records for dogs and make the records

available for APHIS inspection. 9 C.F.R. § 3.13(b). If a problem is identified, the record must

state the date and description of the problem, examination findings, test results, plan for

treatment and care, and treatment procedures performed, when appropriate. 9 C.F.R.

§ 3.13(b)(2).  The medical records must also include the names of all vaccines and treatments

administered and the dates of administration. 9 C.F.R. § 3.13(b)(3). The records must also

include the dates and findings/results of all screening, routine, or other required or recommended

test or examination. 9 C.F.R.  § 3.13(b)(4).

42.     The AWA requires the Secretary to make investigations and inspections as necessary

to determine whether any dealer has violated any provision of the AWA or any regulation or

standard issued thereunder. 7 U.S.C. § 2146(a). The inspector shall, during business hours, have

access to the places of business and the facilities, animals, and those records required to be kept

pursuant to the AWA. *Id.*; *see also* 9 C.F.R. § 2.126 (requiring a responsible adult to be available

to accompany APHIS inspectors during the inspection process).

43.      Under the AWA, United States district courts "are vested with jurisdiction

specifically to enforce, and to prevent and restrain violations of [the AWA], and shall have

jurisdiction in all other kinds of cases arising under [the AWA]," except in one instance not

applicable here. 7 U.S.C. § 2146(c).

44.     Whenever the Secretary has reason to believe that any dealer is "placing the health of

any animal in serious danger" in violation of the AWA or regulations or standards issued

thereunder, the Secretary shall notify the Attorney General, who may seek a temporary

restraining order or an injunction in the United States district court. 7 U.S.C. § 2159(a).

## FACTUAL BACKGROUND

45.     At all times relevant to the allegations in this complaint, Defendants were dealers as that term is defined in the AWA and its implementing regulations, and held AWA license 52-B-0175.

46.     Defendants applied to USDA for a Class B license and were issued license 52-B-0175. By signing the application form, Defendants acknowledged that they had reviewed the AWA and its implementing regulations and standards and agreed to comply with them. *See* 9 C.F.R. § 2.2.

47.     Based on recent inspections of the Chesterfield facility, Defendants have in their possession, control, or care a total of approximately 129 cats and six dogs.

48.     In the last two years, Defendants have failed to have a responsible adult available to accompany APHIS inspectors attempting to conduct an inspection four times in violation of 9 C.F.R. § 2.126. Specifically, APHIS inspectors were unable to access the Chesterfield facility on June 14, 2021, January 27, 2022, July 20, 2022, and December 8, 2022. Exhibit 2 (June 14, 2021 Inspection Report); Exhibit 4 (January 27, 2022 Inspection Report); Exhibit 6 (July 20, 2022 Inspection Report); Exhibit 8 (December 8, 2022 Inspection Report).

49.     Unannounced inspections are critical to ensuring that APHIS inspectors can accurately assess a licensee's compliance with the AWA, and its implementing regulations and standards, and ensure the well-being of AWA-regulated animals.

50.     When Defendants have granted APHIS inspectors access to the Chesterfield facility, APHIS inspectors have documented numerous violations.

51.     After Defendants failed to make a responsible adult available on June 14, 2021, so that APHIS inspectors could inspect the Chesterfield facility, APHIS inspectors returned on July 8, 2021, to conduct a "focused" inspection,[2] during which they discovered two "direct" noncompliant items—one of the most serious types of AWA citation[3]—for failure to provide adequate veterinary care. Exhibit 2; Exhibit 3 (July 8, 2021 Inspection Report).

52.     On August 9, 2021, USDA issued an official warning to Defendants for failure to provide adequate veterinary care to their animals. Defendants failed to come into compliance with the AWA following the official warning.

53.     After Defendants again failed to make a responsible adult available on January 27, 2022, to accompany APHIS inspectors on an inspection, APHIS inspectors returned on April 8, 2022, for a "routine" inspection[4] and found violations of five different AWA regulations and standards. Exhibit 4; Exhibit 5 (April 8, 2022 Inspection Report).

54.     After Defendants again failed to make a responsible adult available on July 20, 2022, Defendants received a citation for failure to maintain sanitary conditions on August 16, 2022. Exhibit 6; Exhibit 7 (August 16, 2022 Inspection Report).

---

[2] A "focused" inspection may include: re-inspection for "direct" noncompliances identified during a previous inspection, re-inspection for a specific noncompliance identified during a previous inspection, a partial inspection of the facility, such as animals only or records only, or a partial inspection to follow up on a public complaint concerning animal welfare. *See* APHIS Animal Welfare Inspection Guide at 3-27, https://www.aphis.usda.gov/animal_welfare/downloads/Animal-Care-Inspection-Guide.pdf (last visited Aug. 29, 2023).

[3] A "critical" noncompliance is one that has a "serious or severe adverse effect on the health and well-being of the animal[s]." Animal Welfare Inspection Guide, USDA, 2-8 - 2-9. A "direct" noncompliance is a critical noncompliance that is having a serious or severe adverse effect on the health and well-being of the animal at the time of the inspection. *Id.* at 2-9.

[4] A "routine" inspection is an unannounced, complete inspection of every aspect of the facility that is regulated under the AWA. Animal Welfare Inspection Guide, USDA, at 3-26 - 3-27.

55.     After Defendants again failed to make a responsible adult available on December 8, 2022, for an inspection, APHIS inspectors returned on March 16, 2023, to find violations of 10 different AWA regulations and standards. The APHIS inspectors issued two "direct" citations for failure to provide adequate veterinary care and failure to ensure that all cats in an enclosure are compatible. Exhibit 8; Exhibit 9 (March 16, 2023 Inspection Report).

56.     APHIS inspectors returned on March 20, 2023, to conduct a focused inspection and issued two direct citations for failure to provide adequate veterinary care to a French bulldog. Exhibit 10 (March 20, 2023 Inspection Report).

57.     APHIS inspectors conducted a routine inspection on April 3, 2023, and identified violations of 14 different AWA regulations and standards, which included one direct and one critical citation for failure to provide adequate veterinary care and failure to safely contain the dogs, respectively. Exhibit 11 (April 3, 2023 Inspection Report).

58.     APHIS inspectors returned on April 19, 2023, to conduct a focused inspection and identified violations of three AWA regulations and standards, which included one direct citation for failure to provide adequate veterinary care. Exhibit 12 (April 19, 2023 Inspection Report).

59.     On July 24, 2023, APHIS inspectors conducted a routine inspection and identified violations of 21 AWA regulations and standards, including two direct noncompliant items for failure to provide adequate veterinary care. Exhibit 13.

60.     APHIS inspectors returned on August 9, 2023, for a focused inspection and identified violations of four AWA regulations and standards, which included two direct noncompliant items for failure to provide adequate veterinary care. Exhibit 14.

61.     In response to the numerous violations of the AWA, the APHIS Administrator issued

a 21-day suspension of Defendants' license on August 11, 2023, which was served on

Defendants on August 14, 2023.


I.      **Defendants Are Placing the Health of Their Cats and Dogs in "Serious Danger" by Failing to Provide Adequate Veterinary Care or Follow Veterinary Instruction.**

62.     APHIS inspectors have consistently identified cats and dogs at the Chesterfield

facility that require veterinary care. But Defendants have refused to seek veterinary care, delayed

seeking veterinary care, or disregarded the treatment plan provided by their attending

veterinarian. Instead, Defendants—neither of whom are licensed to provide veterinary care in the

United States—try to treat their animals themselves, often with expired Russian medications, or

delay treatment claiming that they will bring the animal to Russia in the future for treatment. *See*

Exhibit 9 at 2.

63.     When Defendants' attending veterinarian prescribes medication, Defendants often

decline to purchase it, stating that they have it at their facility. But the medications at

Defendants' facility are labeled in Russian, and many of them appeared to be expired. Exhibit 3

at 2; Exhibit 9 at 2.

64.     When Defendants' attending veterinarian recommends treatment of an animal,

Defendants have sometimes claimed that they will take the animal to Russia for veterinary care.

However, Defendants fail to provide medical records establishing that the attending

veterinarian's treatment plan has been followed or that follow-up veterinary care has been

provided after the treatment. Exhibit 9 at 2.

65.     Defendants' deficient home administration of medical care also extends to

vaccines. As of 2021, the attending veterinarian administered rabies vaccines to the cats,

believing that Defendants gave the cats feline distemper vaccines, which was required by the facility's program of veterinary care. But the vaccine vials for vaccines administered at Defendants' facility were also in Russian and appeared to only be for feline leukemia. Exhibit 3 at 2. Defendants provided no documentation showing that they had given any vaccinations to the cats.

66.     At the time of the April 3, 2023 inspection, Defendants had not scheduled a visit by the attending veterinarian to their facility in 14 months even though the facility's written program of veterinary care requires annual visits to allow the veterinarian to evaluate the adequacy of the husbandry practices and the animals' housing. Exhibit 11 at 2.

67.     When asked for the program of veterinary care during an inspection on July 24, 2023, the facility representative could not locate the program to provide to inspectors. This left APHIS inspectors unable to evaluate whether Defendants were complying with the existing program of veterinary care. *See* Exhibit 13 at 4-5.

68.     Upon information and belief, Defendants do not provide the attending veterinarian timely and accurate information regarding problems of animal health, behavior, and well-being, as required by the AWA. 9 C.F.R. § 2.40(b)(3).

69.     Defendants have received multiple citations for failure to provide adequate veterinary care to their animals dating back several years. On July 8, 2021, APHIS inspectors saw an orange male cat with an eye issue, causing him to hold his eyelid partially shut and begin to cover his eye with his third eyelid membrane. *See* photo below. His eye had a yellow, opaque discharge and the skin surrounding the eye was inflamed. A surgical appointment for the cat's eye was scheduled with the attending veterinarian, but Defendants did not show up to it. APHIS

15

inspectors instructed Defendants to have the cat evaluated by a veterinarian within two days and to follow all prescribed treatments. Exhibit 3 at 3.



70.     During a March 16, 2023 inspection, APHIS inspectors saw a dehydrated adult female tabby cat in poor body condition and in need of urgent veterinary care. She had a large abdominal mass near her hind legs, which was believed to be an abdominal hernia. Defendant Mikirtichev stated that he knew she also had blood in her urine. She was limping and thin, with her hip bones and spine protruding. She also had "skin tent" consistent with dehydration, meaning that the skin on the back of her neck delayed returning to its normal position after being tented. Defendant Mikirtichev represented that the cat had arrived the day before: the purchaser returned her because of an inability to pay for veterinary care, and Defendant Mikirtichev had agreed to get her treated. But Defendant Mikirtichev had not informed the attending veterinarian of the cat's condition. Instead, he stated that he planned to seek unauthorized medical treatment from an unknown source in Russia in six weeks. Waiting six weeks to provide treatment for a serious condition and forcing the animal to travel internationally for that treatment would result in the needless suffering of a critically ill animal. APHIS inspectors directed Defendant Mikirtichev to take the cat immediately to a veterinarian. Exhibit 9 at 3-4.

16

71.     Also on March 16, 2023, an adult male French bulldog named Senya was observed with a large four-week-old wound on his neck. *See* photo below. The facility representative stated that the wound was being treated with topical antiseptic and ointment, but Defendants never reported the wound or any treatment plans for the injury to the attending veterinarian as required by AWA regulations. Exhibit 9 at 4.



72.     When APHIS inspectors returned to Defendants' premises four days later, they saw an 8-year-old female French bulldog named Tina with multiple worn and fractured teeth. Exhibit 10 at 3; *see* photo below. When the fractured upper right tooth was manipulated, the dog was resistant to touch and in pain. *Id.* The inspectors reviewed the dog's medical records and saw that the attending veterinarian had diagnosed the dog with a severe tooth fracture in April 2020—almost three years prior. *Id.* at 2. At that time, the attending veterinarian had recommended a dental procedure to address the issue and reiterated that recommendation in June 2021. *Id.* But as of March 20, 2023, the female dog still had not received veterinary care for the fractured tooth. Exhibit 10 at 2-3.

73.     Following the March 20, 2023 inspection, Defendants brought a male French bulldog named George to the attending veterinarian where he was diagnosed as heartworm-positive. As part of his medical treatment plan, the attending veterinarian instructed Defendants



to restrict George's activity. Upon inspection on April 3, 2023, however, George was observed running around, panting, and interacting with another dog in his usual 10-foot-by-23-foot enclosure. Exhibit 11 at 2-3.

74.     Also during the April 3, 2023 inspection, four of Defendants' cats had the
following medical conditions easily identified by APHIS inspectors but that Defendants had not
noticed or reported to the attending veterinarian:

    a.   An eight-year-old female white cat had severely swollen and reddened gums
with foul breath, and she showed pain and gum sensitivity when her gums
were touched during the examination. Defendants adopted out this cat six days
later without seeking any veterinary care. Exhibit 12 at 3-4; *see* photo below.



    b.   A two-year-old female calico cat with a malformed right front foot had easily
visible swollen and reddened gums along all of her upper and lower jaws. The
attending veterinarian examined the cat in April 2023 after APHIS's
inspection, prescribing medication for initial treatment and recommending a
follow-up dental procedure for diagnosis and full treatment. Defendants did
not schedule the follow-up procedures to fully diagnose and treat the
condition. More than three months later, the female calico cat still had bright
red gums around the base of each tooth. Exhibit 11 at 3.

    c.   A five-month-old female orange cat had easily visible swollen and reddened
gums along all of her upper and lower jaws. *Id.*

    d.   A male orange tabby cat had missing fur and scratch wounds on the back of
his neck, as well as clear draining and chronic tear staining from his right eye.
*Id.*

75.     When APHIS inspectors returned on April 19, 2023, they observed a smaller pen
located within the larger dog enclosure on the premises, which, according to Defendants, was

built to contain George the bulldog and restrict activity as instructed by the attending

veterinarian. However, at the time of inspection, George was found outside of the restricted area

running with another dog in the larger dog enclosure. Exhibit 12 at 2.

76.     Also on April 19, 2023, APHIS inspectors observed a black-and-white kitten

named Gerschwind with an eye issue. The tissue around his eyes was inflamed and bright pink,

and he was squinting and using his third eyelids to partially cover each eye. *See* photo below.

Defendant Mikirtichev admitted that the kitten's eye condition had gotten worse over the last

several days. Nevertheless, Defendants had not notified the attending veterinarian about the

kitten's worsening eye condition. Moreover, Defendants had failed to bring the kitten to the

attending veterinarian for a re-check appointment scheduled about 10 days earlier following the

diagnosis of an upper respiratory infection by the attending veterinarian on April 4, 2023. Exhibit

12 at 2-3.



77.     During the April 19, 2023 inspection, Defendant Mikirtichev also informed the APHIS inspectors that, rather than getting the eight-year old white cat with severely reddened, swollen, and painful gums veterinary care as APHIS inspectors had instructed, Defendants transferred the cat to a new owner. *Id.* at 3-4.

78.     On July 24, 2023, APHIS inspectors observed four brown tabby kittens that had runny eyes and were sneezing. One female kitten had mild yellow nasal and eye discharge, and one male kitten had tan nasal discharge. One male kitten had dried crusts on both of his eyes, and another male had clear watery discharge from his right eye. Defendants had not communicated the kittens' condition to the attending veterinarian. Exhibit 13 at 3. During the August 9, 2023 inspection, APHIS inspectors discovered that Defendant Mikirtichev had called the attending veterinarian about the four kittens, who prescribed antibiotic eye ointment twice daily for at least 10 days and told Mikirtichev to bring the kittens in to the vet in two days if they were not better. However, Defendant Mikirtichev administered the eye ointment for only one day and then stopped. On August 9, one of the male kittens had mild clear discharge from his eyes and a moderate milky discharge from his nose. He was sneezing and made snuffled breathing noises. Defendant Mikirtichev maintained to the inspector that all the kittens were "fine." Exhibit 14 at 3.

79.     Also on July 24, 2023, APHIS inspectors saw a two-year-old female dilute calico with discharge from both eyes, nasal discharge from her left nose, and severely inflamed gums at the base of every tooth. Her left eye had accumulated dried black debris that the inspector easily removed, and her left nostril also had some dried black debris. Her right eye had clear discharge. Defendants had not yet identified these conditions or reported them to the attending veterinarian. Exhibit 13 at 3.

21

80.     During the August 9, 2023 inspection, Defendant Mikirtichev told APHIS inspectors that he had brought the calico to the attending veterinarian but that she had found nothing wrong. However, APHIS inspectors confirmed with the attending veterinarian that she had advised immediately beginning medical treatment for the eyes and upper respiratory symptoms and to schedule a dentistry procedure within 30 days. After the visit, Defendant Mikirtichev told the veterinarian that the cat was pregnant, and the vet advised him to only administer the topical medicine to her eyes and to bring her in 10 days after the previous appointment. Defendant Mikirtichev did not bring the cat in for her follow-up appointment. And more than two weeks later, the calico still had dried clear discharge from her left eye and severely inflamed gums. Exhibit 14 at 2-3.

81.     On July 24, 2023, APHIS inspectors also saw an extremely thin five-year-old female black tabby. The inspector could easily encircle the cat's spine with one hand with her fingers touching at the bottom. The inspector could also easily feel the cat's hip bones, shoulder blades, and spine, and there was minimal fat along her rib cage. A second female tabby was also very thin with obvious muscle loss and minimal fat, and the inspector could easily feel her hip bones, shoulder blades, and spine. Despite the cats' body conditions, Defendants had attempted to breed them. The black tabby had a large area of hair loss with thickened inflamed skin and an abrasion on the back of its neck, which Defendant Mikirtichev stated resulted from breeding. *See* photo below. Defendants had no plan to have the cats' body condition evaluated by the attending veterinarian before breeding. Nor had Defendants identified or communicated the condition of the two cats to the attending veterinarian. Exhibit 13 at 3.



82.     A little more than two weeks later, the five-year-old female black tabby was still extremely thin. Her ribs, shoulder blades, hip bones, and spine could all still be easily felt, and each of her vertebrae was easily distinguishable. She also still had the abrasion on her back. The attending veterinarian had examined the cat and instructed Defendants to isolate her to reduce her stress, eliminate competition for food, and to allow monitoring of her eating. But Defendants failed to follow the attending veterinarian's advice and instead still housed her with four other cats. Their room only had one food bowl which could feed three cats at a time. At the time of the August 9, 2023 inspection, the food bowl was empty. When the cats were offered food, three of the five cats began eating continuously and in an eager manner. Another cat waited in close proximity unwilling or unable to approach the group to eat. Exhibit 14 at 2.

83.     Also, during the July 24, 2023 inspection, APHIS inspectors observed a brown tabby male kitten whose chest was compressed upwards towards his spine, a condition known as pectus excavatum. This chest malformation caused the kitten to gasp and struggle for breath when picked up. Defendant Mikirtichev claimed he had seen kittens like this before and did not alert the attending veterinarian about the chest malformation. Instead, he attempted to treat it

himself by trying to splint the kitten's chest cavity using a toilet paper tube. He was unsuccessful, but still did not alert the attending veterinarian. Defendant Mikirtichev told APHIS inspectors that he thought that kittens with this condition cannot be treated until they are six months old. But Defendants' own website states that a kitten with this condition should "immediately" be taken to a veterinarian "the moment you notice" the condition. http://www.dreamcoon.com/facts-about-maine-coons/index.php?ELEMENT_ID=634811 (last visited Aug. 29, 2023). APHIS inspectors instructed Mikirtichev to bring the kitten to the veterinarian. Exhibit 13 at 2.

84.    Defendant Mikirtichev did not bring the malformed kitten to the vet until August 4, 2023—11 days after APHIS inspectors instructed him to do so. The veterinarian recommended surgery within two weeks or alternatively, given the severity of the kitten's disease, humane euthanasia. When APHIS inspectors arrived at Defendants' facility five days later, the kitten had significantly deteriorated. He was housed with his mother, three other adult female cats, and 13 kittens. He had respiratory distress during a short period of handling and was very thin with prominent hips, spine, shoulders, and ribs. He had active diarrhea with wet, pale, and pasty feces covering his rump and hind legs. Although Defendant Mikirtichev acknowledged that the kitten was not doing well, he had not told the veterinarian about the kitten's worsened condition or provided adequate follow-up care. Upon information and belief, the kitten died that evening. Exhibit 14 at 3-4.

## II.    Defendants Are Placing the Health of Their Cats and Dogs in "Serious Danger" by Putting Them in Distressing Housing Conditions.

85.    Defendants have placed the health of their animals in "serious danger" by housing them in distressing situations that contribute to declines in the animals' health.

86.     Defendants house cats with other cats that fight and bully them, causing them physical injury or preventing them from accessing food or water. Defendants also create over-crowded housing conditions in too-small enclosures that lead to increased levels of stress and respiratory disease in their cats.

87.     On March 16, 2023, APHIS inspectors noted that Defendants were housing a female tabby cat that they knew was ill and needed treatment for an abdominal hernia in an enclosure of more than 12 adult cats. During the inspection, APHIS inspectors observed the cat attempt to approach the enclosure's single water dish multiple times. In her condition, she struggled to access water because every time she tried to approach the bowl, one or more of the other cats would move in to push her away. Exhibit 9 at 7; *see* photo below. APHIS inspectors examined her skin and determined that she was suffering from moderate dehydration. Exhibit 9 at 7.



88.     Several weeks later, inspectors saw a wounded orange tabby male cat housed with another male cat that he had fought with in past breeding seasons, along with 13 female cats. Exhibit 11 at 7.

89.     And, as previously discussed, on August 9, 2023, APHIS inspectors saw that Defendants had failed to separate from other cats an extremely thin black female tabby cat as the attending veterinarian had directed to reduce stress and competition for food. Exhibit 14 at 2. At the time of the inspection, there was only one empty food bowl in the area where the tabby was housed with four other cats. *Id.* When the cats were offered food, three of the five cats began eating continuously in an eager manner. *Id.* Defendant Mikirtichev tossed the black tabby toward the bowl and she began to eat.

90.     Defendants also provided housing that was too small for the cats and prevented them from moving normally and engaging in natural behaviors.

91.     On July 24, 2023, APHIS inspectors noted that eight primary cat enclosures housing a total of 12 adult cats and 16 kittens were only 20 inches tall instead of the required 24 inches. Exhibit 13 at 6-7. Four enclosures, housing a total of four adult cats and 23 kittens, were so small that the cats had to sit or lie in the litter boxes. One adult cat had fresh feces caked in her tail, and other cats and kittens had cat litter or dried feces on their paws. *Id.* at 7; *see* photo below. Four of the enclosures with eight young adult cats did not meet minimum floor space requirements, increasing the likelihood of the cats' discomfort, distress, and conflict. Exhibit 13 at 7. The shelters in the outdoor enclosures were also too small and kept the cats from standing, sitting, or turning freely. *Id.* at 6.



92.     Defendants failed to provide their cats with housing that had elevated resting surfaces, which prevented the cats from exhibiting some of their natural behaviors, increasing stress in the animals.

93.     On July 24, 2023, APHIS inspectors saw that 22 adult cats and 57 kittens had either no elevated surface at all or an insufficient surface size for the number of cats. Defendants had added small stools to some of the wire enclosures, but they were not large enough for a single kitten to comfortably rest on them. And the one larger stool that Defendants added to an enclosure was not large enough for the mother cat and four kittens housed in the enclosure to all rest on top of it. Exhibit 13 at 8.

III.    **Defendants Are Placing the Health of Their Cats and Dogs in "Serious Danger" by Exposing Them to Unsanitary and Unsafe Conditions.**

94.     Defendants are placing the health of their cats and dogs in serious danger by failing to hire a sufficient number of adequately trained employees to maintain the facilities in compliance with the AWA.

95.     Upon information and belief, Defendants employ only one person to help care for over 100 animals at their facility, leading to dangerous deficiencies in the animals' housing, monitoring, and husbandry. But because the employee does not speak English—only Russian— APHIS inspectors cannot confirm if the employee knows enough about animal husbandry to adequately care for the dogs and cats. APHIS inspectors also cannot confirm that the employee understands the program of veterinary care, which is written in English. An insufficient number of adequately trained personnel can lead to a failure to maintain the facility in compliance with the AWA's minimum requirements and delayed care of the animals.

96.     Defendants have failed to maintain the animals' housing facilities in a safe and sanitary manner that protects their cats and dogs from illness and injury.

97.     On March 16, 2023, APHIS inspectors observed over 20 piles of fresh and dried feces scattered throughout an outdoor enclosure containing two adult French bulldogs. Exhibit 9 at 8.

98.     Also on March 16, 2023, Defendants had a full mop-bucket of dirty bleach water in the center of a room that served as a primary enclosure for two cats. *See* photo below. As Defendants' website notes, bleach is a toxic substance that can give animals chemical burns and respiratory irritation. Exhibit 9 at 6; http://www.dreamcoon.com/facts-about-maine-coons/index.php?ELEMENT_ID =637058 (last visited Aug. 29, 2023).



99.     At the time of the March 16, 2023 inspection, of the six outdoor dog enclosures containing 10 dogs on the property, none of the enclosures contained bedding or were properly weatherproofed. The overnight temperatures reported for the area the two nights before the inspection ranged from 28ºF to 40ºF. Exhibit 9 at 7.

100.     When APHIS inspectors returned a few weeks later, Defendants' French bulldogs were still being housed in outdoor enclosures without approval of the attending veterinarian. As French bulldogs are a small, short-nosed breed, they are highly susceptible to heat exhaustion and cannot tolerate cold temperatures for long periods of time. Defendants acknowledge the breed's particular sensitivity to extreme temperatures on their website, noting that new owners should be "careful" in hot weather and provide warm layers in colder weather. *See* http://www.the-french-bulldogs.com/ (last visited Aug. 29, 2023). Temperatures prevalent in the area reach numbers that are likely to be unsafe during both summer and winter months. When

asked, the attending veterinarian stated that she was uncomfortable with housing the French

Bulldogs outdoors. Exhibit 11 at 5-6.

101.    The primary outdoor dog enclosures also do not have the ability to adequately

secure the animals. *See* photo below. Two female French bulldogs were reported by Defendants

to have escaped from their enclosures in July and November of 2022 and the two dogs were

never recovered. Exhibit 11 at 6.



102.    During each April 2023 inspection, APHIS inspectors observed a dog running

around outside of its primary enclosure. Exhibit 11 at 6; Exhibit 12 at 4. One dog managed to

escape again and was seen running freely in the main yard. Exhibit 12 at 4.

103.    On July 24, 2023, APHIS inspectors noted that Defendants had begun housing the

dogs in wire indoor crates when outdoor temperatures exceeded 80ºF at the advice of the

attending veterinarian. However, five out of six dogs were not being provided the minimum

amount of space required by the AWA when housed in these crates. One dog's enclosure was

only one inch taller than his recorded height while standing and his ears were observed sticking

out of the top of the crate when he was in a normal sitting position. *See* photo below. Two female

dogs were also observed being housed together in one wire crate with only half of the total

required space. Exhibit 13 at 8-9.



104.    At the time of the inspection, the dogs did not have continuous access to potable

water. *Id.* at 9.

105.    As discussed above, on July 24, 2023, APHIS inspectors noted that four of the cat

enclosures were so small that the cats had to sit or lie in the litter boxes, causing one adult cat to

have fresh feces caked in her tail, and other cats and kittens had cat litter or dried feces on their

paws. *Id.* at 7.

106.    APHIS inspectors also found cat trees in Defendants' indoor enclosures with

mostly unraveled sisal rope. *See* photo below. Linear foreign bodies, such as unraveled sisal

rope, if ingested, can cause a life-threatening intestinal blockage in cats. Exhibit 13 at 5.



107.   As of July 2023, one of the outdoor cat enclosures did not provide enough shelter to protect all the cats housed in it from the elements. *Id.* at 6.

108.   Piles of junk, waste, and hazardous materials have been observed in and around the primary outdoor dog enclosures during multiple inspections between April 2022 and April 2023. *See* photo below. One of the dog enclosures contained a large bundle of discarded electrical cable. Exhibit 9 at 8. APHIS inspectors noted that wires and electrical cords located in the dogs' primary enclosures were chewed to shreds as the dogs were forced to use these materials as enrichment due to a lack of toys and other safe enrichment options.



109.    Piles of waste and sharp, hazardous materials have also been observed in areas surrounding the outdoor dog enclosures, where Defendants often let the dogs roam when they are not in their primary enclosures. *See* photo below.



110.    APHIS inspectors have also observed that five out of six outdoor dog enclosures have walls that are made of wire, unsealed wood, and plastic lattice. The walls contain multiple sharp points caused by broken or bent wire which could cause injury to the dogs. *See* photo below; Exhibit 11 at 4.



111.    APHIS inspectors have repeatedly explained the AWA's requirements to Defendants, but Defendants continue not to comply with the requirements of the statute and its regulations. APHIS inspectors have also offered to bring in translators to overcome any barrier that Defendants' native language may pose, but Defendants have consistently refused.

## IV.    Defendants Are Violating the AWA by Failing to Keep and Maintain Adequate Records.

112.    Defendants have received multiple citations for inaccurate record-keeping practices that prevent APHIS inspectors from tracking animals over time and following up on noted issues.

113.    In April 2022, Defendants' records of cats they acquired or had on hand did not document the cats' sex, acquisition date, or birthdate. Several disposition records—records of

whether animals are removed or sold versus dead or euthanized—did not have the cats' sexes. Exhibit 5 at 2.

114.    In July 2023, Defendants presented APHIS inspectors many incomplete or inaccurate records. Exhibit 13 at 4. For example, APHIS inspectors found that 26 of Defendants' cats had no identified gender, 10 cats purportedly imported from Russia had no date of birth or approximate age at time of import, and six cats born on Defendants' property had no date of birth. Defendants did not identify kittens on cage cards using any identifiable information such as gender or color, claiming that those details are not added until the kittens reached eight weeks of age. Exhibit 13 at 4. Additionally, Defendants did not record the method of disposition for certain animals, such as by sale or euthanasia, which prevents USDA from being able to track animals on Defendants' inventory. *Id.*

115.    APHIS inspectors also found that medical records for Defendants' dogs did not have the name and date of administration of all required vaccinations or the names of medical treatments and the dates they are administered. Exhibit 11 at 9; Exhibit 13 at 11. While the medical records indicate that multiple dogs were prescribed medications for various ailments, the records contain no documentation of the medications being administered. Exhibit 11 at 9.

116.    In addition, medical records for two dogs did not include the results of routine examinations and diagnostic tests. While the records indicate that several diagnostic tests were performed at the dogs' yearly examinations, results were not provided for many of those tests. Exhibit 13 at 11.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Injunctive Relief: Defendants Violated and Will Continue to Violate the AWA by Placing the Health of Their Animals in Serious Danger

117.   The United States incorporates by reference the allegations of the Complaint.

118.   Defendants are placing the health of their cats and dogs at their Chesterfield facility in serious danger in violation of the AWA and its regulations and standards. 7 U.S.C. § 2159(a).

119.   Defendants are placing the health of their cats and dogs in serious danger by failing to provide adequate veterinary care in violation of 9 C.F.R. §§ 2.40(a), (b), 3.13(a).

120.   Defendants are placing the health of their cats and dogs in serious danger by failing to provide housing with adequate space and exposing the animals to distressing conditions in violation of 7 U.S.C. § 2143(a)(1), (2); 9 C.F.R. § 3.6(b).

121.   Defendants are placing the health of their cats and dogs in serious danger by exposing them to unsanitary and unsafe conditions in violation of 7 U.S.C. § 2143(a)(1), (2); 9 C.F.R. §§ 3.1, 3.4, 3.6, 3.10, 3.11, 3.12.

122.   Unless enjoined, Defendants will continue to place the health of these animals in serious danger in violation of the AWA and its regulations and standards.

123.   The United States is entitled to an injunction to prevent and restrain Defendants from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2159(b).

### Second Claim for Relief
### Injunctive Relief: Failure to provide adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. §§ 2.40, 3.13(a)

124.   The United States incorporates by reference the allegations of the Complaint.

125.   As set forth above, Defendants are violating the AWA and its implementing regulations and standards by failing to provide their cats and dogs with adequate veterinary care in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. §§ 2.40, 3.13(a).

126.   Unless enjoined, Defendants will continue to violate the AWA, and its regulations and standards, causing needless suffering and, in some cases, the death of animals at their facility.

127.   The United States is entitled to an injunction to prevent and restrain Defendants from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

**Third Claim for Relief**
**Injunctive Relief: Failure to provide housing of adequate space and exposing them to distressing conditions in violation of 7 U.S.C. § 2143(a)(1), (2) and 9 C.F.R. § 3.6(b)**

128.   The United States incorporates by reference all allegations of the Complaint.

129.   As set forth above, Defendants are housing the animals at the Chesterfield facility in over-crowded and too-small housing conditions in violation of the AWA and its implementing regulations and standards. *See* 7 U.S.C. § 2143(a)(1), (2); 9 C.F.R. § 3.6(b).

130.   Unless enjoined, Defendants will continue to violate the AWA, and its regulations and standards, causing needless suffering and, in some cases, the death of animals at their facility.

131.   The United States is entitled to an injunction to prevent and restrain Defendants from operating in violation of the AWA and its implementing regulations and standards. 7 U.S.C. § 2146(c).

**Fourth Claim for Relief**
**Injunctive Relief: Failure to maintain safe and sanitary conditions in violation of 7 U.S.C. §**
**2143(a)(1), (2) and 9 C.F.R. §§ 3.1, 3.4, 3.6, 3.11, 3.12**

132.     The United States incorporates by reference all allegations of the Complaint.

133.     As set forth above, Defendants are exposing the animals at the Chesterfield

facility to unsafe and unsanitary conditions in violation of the AWA and its implementing

regulations and standards. *See* 7 U.S.C. § 2143(a)(1), (2); 9 C.F.R. §§ 3.1, 3.4, 3.6, 3.11, 3.12.

134.     Unless enjoined, Defendants will continue to violate the AWA, and its regulations

and standards, causing needless suffering and, in some cases, the death of animals at their

facility.

135.     The United States is entitled to an injunction to prevent and restrain Defendants

from operating in violation of the AWA and its implementing regulations and standards.

**Fifth Claim for Relief**
**Injunctive Relief: Failure to create and maintain complete and accurate records in**
**violation of 7 U.S.C. § 2140 and 9 C.F.R. §§ 2.75(a)(1), (2) and 3.13(b)**

136.     The United States incorporates by reference the allegations of the Complaint.

137.     As set forth above, Defendants are violating the AWA, and its implementing

regulations and standards, by failing to create and maintain complete and accurate records in

violation of 7 U.S.C. § 2140 and 9 C.F.R. §§ 2.75(a)(1), (2) and 3.13(b).

138.     The United States is entitled to an injunction to prevent and restrain Defendants

from operating in violation of the AWA and its implementing regulations and standards. 7

U.S.C. § 2146(c).

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that the Court:

1.  Declare that Defendants have violated and continue to violate the AWA by placing the
    health of their animals in serious danger, 7 U.S.C. § 2159;

2. Declare that Defendants have violated and continue to violate the AWA, 7 U.S.C. § 2143(a)(1), (2), and its implementing regulations and standards;

3. Declare that Defendants have violated and continue to violate the AWA, 7 U.S.C. § 2140, and its implementing regulations and standards;

4. Preliminarily enjoin and restrain Defendants from violating the AWA by placing the health of their animals in serious danger, 7 U.S.C. § 2159;

5. Preliminarily and permanently enjoin and restrain Defendants from violating the AWA, 7 U.S.C. § 2146(c);

6. Award the United States its costs in this action; and

7. Grant other relief that the Court deems just and proper.


DATED: August 30, 2023


JESSICA D. ABER
UNITED STATES ATTORNEY

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division


By: /s/
    Robert P. McIntosh
    Virginia Bar Number 66113
    United States Attorney's Office
    919 East Main Street, Suite 1900
    Richmond, Virginia 23219
    Telephone: (804) 819-7404
    Facsimile: (804) 771-2316
    Email: Robert.McIntosh@usdoj.gov

/s/ *Mary Hollingsworth*
MARY HOLLINGSWORTH
Senior Trial Attorney
KAMELA A. CASCHETTE
BONNIE M. BALLARD
Trial Attorneys
United States Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Email: Mary.Hollingsworth@usdoj.gov
Tel: 202-598-1043
Email: Kamela.Caschette@usdoj.gov
Tel: 202-305-0340
Email: Bonnie.Ballard@usdoj.gov
Tel: 202-305-1513
Fax: 202-305-0275
*Attorneys for the United States of America*